Filed 12/10/13  P. v. Wilson CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048176 |
| v. | (Super. Ct. No. 12HF2278) |
| DANA LEE RUSSELL WILSON, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Thomas M. Goethals, Judge.  Affirmed.

Dana Lee Russell Wilson, in pro per.; and Richard Jay Moller, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Respondent.

\*        \*        \*

A jury convicted defendant Dana Lee Russell Wilson of misdemeanor brandishing a deadly weapon (Pen. Code, § 417, subd. (a)(1)),[1] but deadlocked on the remaining charges of assault with a deadly weapon other than a firearm (§ 245, subd. (a)(1)), the lesser included offense of simple assault (§ 240), and making a criminal threat (§ 422, subd. (a)) with an enhancement allegation of personally using a deadly weapon (§ 12022, subd. (b)(1)). The court declared a mistrial on the deadlocked counts, and sentenced defendant to time served of 45 days in actual custody and 45 days of conduct credit for a total of 90 days. The court also imposed a state restitution fine of $240, a court operations fee of $40, and a criminal conviction assessment fee of $35.

Defendant timely filed a notice of appeal, and we appointed counsel to represent him. Counsel did not argue against defendant, but advised the court he was unable to find an issue to argue on defendant's behalf. Defendant was given the opportunity to file written argument in his own behalf, and he has done so, submitting a 37-page handwritten brief.

We have examined the entire record but have not found an arguable issue. (*People v. Wende* (1979) 25 Cal.3d 436.) Accordingly, we affirm the judgment.

FACTS

We recite the facts in the light most favorable to the judgment, limited to those facts that are germane to the sole misdemeanor count of brandishing. (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

Defendant entered Sportsman's Liquor Store in Newport Beach, purchased a 12-pack of beer, brought the beer outside, and handed the beer to a person appearing to be underage. Tony Tran, the store employee who had sold the beer to defendant, became

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

upset because, in his words, "we can lose our license for that, people buying beer for minors and stuff." Defendant returned to the store 15 or 20 minutes later. Tran told defendant, "We don't tolerate people buying beer for minors and . . . we don't welcome people like that in our business." Tran asked defendant to leave. Defendant became belligerent and started "yelling and hollering and cussing."

After Tran repeatedly asked defendant to leave, he finally left and stood outside the front door. Tran's friend, Hung Duong, was outside helping Tran by brushing the front parking lot with a broom. Defendant directed his attention toward Duong, cussing at him. Duong also asked defendant to leave and an argument ensued. Duong came into the store and asked Tran to call the police because defendant had pulled a knife on him. Before calling the police, Tran went outside to see if it was true or not. Defendant was standing behind a car in the parking lot holding a knife. Tran heard defendant say he would stab Duong in the heart if he did not back off. Defendant was holding the knife in his hand, raised over his right shoulder, and rocking his arm back and forth in a stabbing motion. Tran ran back into the store, retrieved some pepper spray, returned to the parking lot, and told defendant to leave or he would use the pepper spray on him. Defendant started inching closer to Tran and Duong, making the same motion with the knife, and saying he was going to start stabbing people. Tran sprayed defendant with the pepper spray, ran back inside, and called 911. The police responded and arrested defendant.

Other evidence will be discussed as necessary in connection with our consideration of potential issues suggested by counsel, and the arguments made by defendant in his supplemental brief.

DISCUSSION


*None of the Issues Suggested by Counsel Are Potentially Arguable on Appeal*

To assist the court with its independent review of the record, defendant's counsel suggests we consider nine potentially arguable issues.  (See *Anders v. California* (1967) 386 U.S. 738.)  We address each potential issue in turn, and conclude none are arguable.

1.  The court instructed the jury with CALCRIM No. 3476, which states that a lawful occupant of property may use reasonable force to make a trespasser leave if the trespasser poses a threat to the property or its occupants.  Counsel suggests we consider whether that instruction should not have been given.  But defendant asserted his actions were undertaken in self-defense.  And it is well established that if a victim has a right to use force to defend his property, defendant has no right of self-defense to resist the lawful use of reasonable force.  (See *People v. Waite* (2002) 100 Cal.App.4th 866, 878.)  The issue was properly tendered to the jury with CALCRIM No. 3476.  There was no error.

2.  Counsel also suggests we consider whether the court's declaration of a mistrial on counts 1 and 2, with defendant's consent, would bar a retrial on those counts on double jeopardy grounds.  As counsel acknowledges, however, the double jeopardy issue would only be relevant if the People choose to retry defendant on those counts.  The issue is not ripe for review on this appeal.

3.  Defendant represented himself at trial.  Counsel suggests we review his *Faretta* waiver, but does not suggest the existence of any particular error.  (*Faretta v. California* (1975) 422 U.S. 806.)  Defendant executed a form *Faretta* waiver in writing, and the court read aloud each of the items contained on the form, and asked defendant after reading each item whether he understood the admonishment contained on the form.  Defendant said he did, in a most positive fashion.  For example, when defendant was told

4

"it is almost always unwise for you to represent yourself and, in so doing, you may conduct a defense which may aid the prosecutor in convicting you of the charges." "Do you understand that?" Defendant responded, "I do. I absolutely understand that, your honor." It appears from the record that defendant fully understood the risks of self-representation, and he embraced the prospect of doing so with enthusiasm. We are unable to perceive any arguable error.

4. During deliberations, the jury asked the following question: "Does [defendant] have any prior record, offenses around his knife?" The court responded: "You now have before you all of the evidence that you may consider during your deliberations. Please thoroughly review it again as you continue to deliberate." Based on this exchange, counsel suggests we consider the possibility of jury tampering. But there is absolutely no evidence of jury tampering. The court's response to the jury's question was appropriate. There is no arguable issue here.

5. Defendant testified during trial that Duong opened his car trunk and pulled out two four-foot long swords and started striking the swords back and forth, striking the ground and making sparks "like he's going to cut me from the ground up in pieces." Defendant asked to admit into evidence his own written statement he had voluntarily given to the Newport Beach Police Department in which he made the same or similar statements. The court excluded the evidence as "classic hearsay." The court explained it had considered Evidence Code sections 1235 and 1236 (inconsistent and consistent prior statements) and concluded the necessary foundation for those hearsay exceptions was absent. The court was right. The written statement was consistent with defendant's testimony at trial, but there was *no* suggestion defendant had made a prior inconsistent statement, or that defendant's testimony at trial was recently fabricated or influenced by improper motive. (See Evid. Code, § 791.) Defendant apparently believed Duong had brandished swords, and his belief never wavered. Counsel suggested we

5

consider whether the ruling was erroneous. At counsel's urging, we have considered the issue, and conclude the court's ruling is not arguably erroneous.

6. Prior to trial, defendant complained he was a vegan, was "starving," and had lost weight. The court asked, "Are you telling me you don't feel mentally competent to go to trial? [¶] . . . [¶] If you're not mentally competent, I don't want you to go to trial. Are you telling me you're not competent?" Defendant responded, "That's not what I'm saying. I need these guys to feed me. [¶] Yes, I'm mentally competent. Fortunately I'm the kind of person I am but they are killing me. They are starving me to death." After an extended conversation in which the court learned defendant had seen a doctor four days earlier, the court commented, "I'm not sure what else you're asking me to do." Defendant responded, "I don't either. That's why I wanted to say something to somebody, because I don't know what to say to anybody." The court concluded the conversation by saying, "For the record, you don't look bony and emaciated. For me you're obviously a very sharp fellow. You're very lucid and responsive. I don't see any indication of incompetence or lack of ability." The court fulfilled its obligation to ascertain defendant was competent to stand trial. And defendant had been seen by a physician shortly before trial. Nothing more could be expected of the trial judge. There is no potentially arguable appellate issue concerning defendant's mental or physical competence or ability to proceed to trial.

7. Counsel notes that defendant sought to impeach Newport Beach Police Officer David Henderson, and in connection with that request filed a motion which he characterized as a motion for discovery of exculpatory evidence. But Henderson was not called as a witness at trial, although he had testified at the preliminary hearing. The court explained to defendant that "the percipient witnesses in this case are all civilians." "The police officers weren't there when the alleged felonious conduct occurred so all of the arguments and all of the conversations and all of your argument in your pleading has to do with the credibility of police officers who were not the percipient eyewitnesses to this

6

crime." The court declined to make any orders on defendant's motion "because at [that] point it [had] to do with impeaching Officer Henderson apparently who is not going to testify." The court was correct. The issue is not arguable.

8. Counsel suggests we consider the circumstances surrounding the playing of certain video recordings. The prosecutor requested leave to play for the jury a short excerpt from a video recording depicting defendant's arrest. The excerpt contained nothing more than one of the responding police officers, Officer Neil Schuster, asking defendant for his name, date of birth, and "California ID number." Defendant requested that the entire video be played pursuant to Evidence Code section 356. The court asked, "Do you want the whole thing played?" Defendant responded, "Yes, of course, because you get the whole picture." The court repeated itself, asking again, "You want the whole thing?" Again, defendant responded, "Of course, yes. Taking one part of it, nobody can be confident in what is represented. And in addition, you'll see the difference — let's put it this way: He's taken the most volatile. When I'm first in the car and I got pepper-sprayed, it's just like —" The court granted defendant's request to play the entire video. After the video was played, the prosecutor asked Officer Schuster to explain the meaning of a radio call "1032 foxtrot" heard on the video. The officer answered that "1032 foxtrot is a radio call that lets officers know[] that the suspect that we've run — or we've run a records check on has a felony warrant for that arrest." The officer went on to explain that defendant had a felony arrest warrant out of Georgia, but Georgia would not seek to extradite. Defendant did not object to this testimony at the time it was given, although in a pretrial conference, based on the information then before it, the court had ruled that all of defendant's criminal history was excluded including the Georgia warrant. Defendant also insisted that another video, the so-called Henderson video be played for the jury. In both videos, the defendant is shown and heard to be given his *Miranda* warning and

invoking his *Miranda* rights.[2]  Later, when considering which exhibits would be received in evidence, the court explained that it would "never have permitted the jury to see that, Mr. Wilson, had you done anything but insist that it be played in its entirety."  The court further stated, "In any other circumstance it would be error for me to permit a jury to see that, but I permitted it because you invited the error to occur.  And so I just want the record to reflect that I understand what the law is in that area and I never would have let that happen . . . . That is almost categorically inappropriate for the jury to see, but you insisted on it so you invited that."  We agree with the trial court's observation.  Any error in playing the videos was invited by the defendant's *vigorous* demands that the videos be played *in their entirety*.  This is not an arguable issue.

9.  The last issue counsel suggested we consider is defendant's assertion that an audio recording of a 911 call made by Stephen Sharpe, one of the civilian witnesses to the brandishing incident, was cut out as a potential exculpatory statement when played for the jury.  According to defendant, Sharpe told the 911 operator that defendant had the knife "on his belt."  But we do not have a record establishing that the potentially exculpatory statement was not played for the jury.  The transcript of the conversation, also admitted into evidence on behalf of the defendant, reflects the 911 operator asking, "[I]s he holding the knife on anyone or does he have it on, on in his pocket or . . . ."  Sharpe responded, "He's got it on his belt.  Cops are on scene."  Moreover, Officer Schuster testified on direct examination that when he "pulled into the parking lot, [he] observed the defendant with a knife on his hip in a sheath."  Thus, there was no controversy in the record about whether defendant had placed the knife in a sheath on his hip by the time the officer arrived.  The brandishing incident forming the basis for the conviction occurred before the police officers arrived.  We are unable to find an arguable issue regarding the asserted deletion from the audio recording.

---

[2]  *Miranda v. Arizona* (1966) 384 U.S. 436.

*Defendant's Arguments Lack Merit*

In his supplemental brief, defendant presents five arguments, often overlapping and repetitive. We will do our best to extract the essence of his arguments.

First, defendant complains that "prosecution never provided documented, written discovery informing the defense of the testimony the prosecution's witnesses intended to offer at trial." But as defendant acknowledges in the very next sentence of his brief, "While there may not be any overt reference to this non-disclosure clearly stated in the record, the fact is that straying and wild accusations proffered by prosecution witnesses . . . under oath, on the witness stand, are full of discrepancies and contradictions . . . ." Simply put, there is no evidence in the record on appeal that would support the contention that the prosecution did not turn over all material in its possession as required by section 1054.1. Defendant's supposition is pure speculation.

Second, defendant raises the same argument suggested by counsel with regard to the assertion that the audio recording of the 911 call deleted the statement, "[H]e's got it on his belt." This issue was examined above in counsel's suggested issue number 9. Defendant has not presented any additional argument that would merit further discussion.

Third, defendant raises the same issue suggested by counsel as issue number 4, namely, the court's response to the jury's question, "Did/does [defendant] have any prior record offenses around his knife?" The court's response is discussed above, and we find the response appropriate. But defendant argues in addition that the court inappropriately responded to a question from the jury that immediately preceded the question about the existence of any prior offenses with a knife. Indeed, the jury had previously sent out a written question (which we do our best to decipher) that read: "'Cowboy' was 'discredited' by evidence of previous incidents w/ a 'deadly' (allegated ice pick) weapon. Why (or is it legal?) to discredit [defendant] with records of previous

9

incidents with the knife (as a deadly weapon)."[3] (Quoted from original with errors of syntax, grammar and spelling retained.) The request was received just before the lunch hour while the prosecutor and defendant were absent and on 30 minute call. Without consulting counsel, the court wrote a note to the jury stating, "I do not understand your question. Can you clarify it?" The jury's question about the existence of any prior offenses by defendant was then delivered to the court and the jurors took their lunch recess. When all parties returned after lunch, the court gave copies of the two questions it had received and advised the parties it had requested clarification of the first question. While it is certainly true that any further instruction to the jury must be given in the presence of the parties (§ 1138), the court did not instruct the jury or give a substantive response of any kind to its first question. The court merely asked for clarification, and that request was surely justified. We do not find any arguable appellate issue regarding these events.

Fourth, defendant argues it was error to exclude evidence of Officer Henderson's misconduct. This is the same as the seventh issue suggested by counsel. Our answer is the same. Henderson did not testify. Thus, his conduct was not in issue for impeachment purposes, and since he did not witness the brandishing incident, it was irrelevant for any other purpose.

Finally, defendant asserts a litany of purported errors which he contends amounts to a demonstration of judicial bias. Our review of the record discloses nothing

---

[3] To explain, "Cowboy" was the nickname of a witness presented by defendant who testified to defendant's nonviolent nature. The prosecutor, with the court's permission, asked "Cowboy" whether he recalled an incident in 2008 when he took a homemade ice pick and swung it three or four times at a victim. "Cowboy" remembered the incident and further volunteered that he had served 90 days on a misdemeanor conviction, although he maintained the 90 days was for something he did not do.

10

of the sort.  On the contrary, the trial judge exhibited extreme patience and even leniency in allowing this self-represented defendant to present his case on his terms.

We have searched the entire record for any other arguable errors, and have found none.


DISPOSITION


The judgment is affirmed.



IKOLA, J.

WE CONCUR:


FYBEL, ACTING P. J.


THOMPSON, J.

11